**Hazel M. RYDER, Appellant,**

**v.**

**UNITED STATES of America, and Richard R. Ryder, Appellees.**

**No. 10745.**

United States Court of Appeals
Fourth Circuit.

Argued Jan. 13, 1967.

Decided Feb. 6, 1967.

Ralph Rabinowitz, Norfolk, Va. (Kelsey & Rabinowitz and Stant, Moss, Rafal & Stokes, Norfolk, Va., on brief), for appellant.

Edward Berlin, Atty., Dept. of Justice (John W. Douglas, Asst. Atty. Gen., and David L. Rose, Atty., Dept. of Justice, and Claude V. Spratley, Jr., U. S. Atty., on brief), for appellee United States.

Before BOREMAN and BRYAN, Circuit Judges, and RUSSELL, District Judge.

PER CURIAM:

By libel Hazel M. Ryder charged the respondent United States with negligence causing her fall and injuries when stepping from the deck of a private yacht to a Navy seaplane, moored in the Rappahannock not far from Deltaville, Virginia. 46 U.S.C. § 781. She now appeals from the District Court's denial of recovery. We affirm.

The findings of the District Judge, derived from conflicting evidence and now not questioned, give this detail of the facts:

"On Saturday, June 11, 1960, Hazel Ryder, Harriett Frank, Anthony and

Richard R. Ryder boarded the FOLLY, Ryder's twenty-four foot Chris Craft cabin cruiser. * * * On the morning of June 12, 1960, they started cruising on the Rappahannock River. The [USS] ALBEMARLE was holding an 'open house' for the public, and a number of people, including the Ryder party, visited aboard the vessel during the day. Twelve seaplanes, including LM–11 constituting Anti-submarine Warfare Squadron VT–44, were moored on the surrounding waters, and apparently a number of small civilian craft were maneuvering among them throughout the day.

"The Ryder party spent about forty-five minutes aboard the ALBEMARLE and upon returning to the FOLLY, they proceeded to the area where the seaplanes were moored. They approached the LM–11 and were invited aboard. They accepted the invitation and were shown through the plane. In their conversation with the men, one of the crew members suggested that if the visitors would go to Urbana and get them some beer, the crew would cook dinner for the Ryder party aboard the seaplane. The FOLLY proceeded to Urbana, and returned to the seaplane with two six-packs of beer. Mr. Ryder testified that they had some difficulty in locating the LM–11 inasmuch as the seaplanes 'all looked pretty much alike.' The cabin cruiser was secured to the seaplane by two lines, and by that time the water was becoming choppy and a strong current was running downriver.

"It took the crew members some thirty minutes to cook the food, and during that period the Naval personnel and the Ryder group were conversing and drinking beer. None of the Ryder party attempted to board the seaplane during this period and Ryder, himself, went below to take a nap. He remained there until notified of Mrs. Ryder's accident. Upon being told that dinner was ready, Mrs. Ryder went across the cruiser deck toward the hatch of the seaplane. A crewman was holding one of the lines to the cruiser and just as Mrs. Ryder was about to step to the hatch, the crewman dropped the line [Footnote omitted.] When the line was released, the FOLLY pitched causing Mrs. Ryder to be thrown partially through the hatch. Her legs were caught between the FOLLY and the seaplane causing the injuries alleged in the libel. The log of the ALBEMARLE reflects that at 1905 hours on the date in question a 'civilian female, name unknown, received aboard for X-ray of left leg injured while attempting to board one of the P5M planes * * *.' In any event, following the accident, the FOLLY left the seaplane and ultimately returned to Deltaville, and on the trip at least some of the group ate the steak which (according to libellant's witness, Harriett Frank) had been passed to the cruiser from the seaplane."

Quite logically, the District Judge looked first to see what duty, if any, was owing by the United States to the libellant. In this he considered Kermarec v. Compagnie Generale Trans-Atlantique 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959) declaring that admiralty did not distinguish between persons aboard, other than the ship's company, as invitees and licensees in the manner of the common law, to determine the ship's or shipowner's obligation to them. There the Court concluded that "the owner of a ship in navigable waters owes to all who are on board for purposes not inimical to his legitimate interests the duty of exercising reasonable care under the circumstances of each case".

The instant circumstances, the District Judge in effect held, showed the libellant's boarding or attempt at boarding the seaplane was for an object "inimical" to the interests of the United States. He put it this way:

"Under the present facts, had libellant been injured while aboard the ALBEMARLE, I think unquestionably the principle of Kermarec would apply; and arguably it might also apply had the injury occurred on the initial visit

to the seaplane. However, I find it impossible to equate libellant's position or status at the time of her injury with that of Kermarec who had boarded a vessel pursuant to a pass issued to him by the executive officer. I do not mean to infer that such a formality would be a *sine qua non* of the application of the Kermarec decision, but I do not think the law as stated therein is so broad in its scope as to render the owner liable to a party attempting to board a vessel during the course of an irresponsible frolic. Unquestionably, the Navy, as owner of the seaplane, would not have countenanced the conduct of the crew members in taking beer aboard the plane or in giving away the food from the plane's galley in exchange for the beer. The fact that such conduct was irregular and unauthorized was known to the Naval personnel, [footnote omitted] and should have been apparent to libellant and the rest of the party on the FOLLY, whether any of them had ever been in Naval service or not."

The Court paraphrased "inimical" as "inconsistent with". The same interpretation with a like result was made at trial in Ribeiro v. United Fruit Company, 284 F.2d 317, 322 (1966) and accepted by the Second Circuit in the absence of an exception to the jury charge so defining the word.

However, our decision need not be put on this head for we read the District Judge as also finding no proof of negligence when he said in summary:

"[U]nder the circumstances libellant's injury did not result from the breach of *any* duty owed to her by the respondent owner. I further conclude that even should I assume that there was a breach of *any* duty, libellant's conduct at the time was of such a nature that it should bar any recovery on her part even under the admiralty doctrine of comparative negligence". (Accent added.)

The notable portion of this statement is that there was no "breach of *any* duty" by the respondent. The words are all-embracing, and we read them as meaning that whatever the duty, none was violated. That this was the finding the District Judge was intending to make is corroborated by the repetition of these words in his reference to the libellant's contributory negligence. We accept the reference—without respect to the law it presupposes—as conclusively indicating that the judge considered the respondent wholly without fault, the libellant exclusively at fault. The record certainly permits such a finding.

Affirmed.